Oyez, Oyez, Oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Raiola, are you ready? Yes, Your Honor. Good morning and may it please the Court. My name is Stephen Raiola. I'm a counsel with Kibler, Fowler & Cave, and I'm the court-appointed amicus curiae supporting appellant in this case. I reserve four minutes for rebuttal. Contrary to the District Court's findings and the officer's claims, a uniform body of Fourth Circuit precedent confirms that Mia's detention in this case violated the Fourth Amendment. As established by this Court's decisions in Curry, Mass and Bergen-Foster, the police cannot detain just anyone who happens to be near the scene of a suspected crime, absent a reason to suspect that the particular person seized had something to do with that suspected crime. In addition, the factors that the officers relied on in this case do not supply the particularized suspicion that was lacking based on Mia's mere proximity to a suspected crime. Instead, they are all objective factors that do little to support reasonable suspicion, because they would be true of anyone who was in a car at 4.20 in the morning, which isn't surprising in Northern Virginia where there are two airports and a large military community, or innocent suspicion-free facts which cannot be relied on to establish reasonable suspicion. Of particular significance here, the officers had the burden of demonstrating that there was no genuine dispute of fact, that the search in this case was constitutional. And given that they had that burden, it's quite telling what the officers failed to allege. They never allege that Mia tried to flee, was uncooperative, or behaving extremely nervously. They never allege that there was a vehicle checkpoint that Mia was trying to avoid. They never allege that the caller that reported the stabbing told the officers that she had personally observed a stabbing, as opposed to simply guessing that the individual in the Shell gas station had been stabbed. Nor did the officers indicate that the caller provided a description of the suspect,  or provided a basis for the officers to suspect that the suspect had fled by vehicle. To this day, the officers haven't even confirmed that a stabbing occurred, so it remains a possibility that the incident at the Shell gas station involved a drunken accident, a suicide attempt, or any other possibility. The fact is that all the officers had in this case is that Mia's driveway was near a suspected crime scene, and Mia was in his car and shut the door, which is why the officers go to such great lengths to try and describe his conduct as suspicious, and accuse him of trying to hide. But those statements are all an improper attempt to twist innocent suspicion-free facts into an indicia of suspicious activity. There is no evidence that Mia was trying to hide. Watch the video. He was simply sitting in his car and slowly closed the door to allow an unidentified vehicle that pulled up behind him to pass to park at the residence. Better yet, common sense belies the notion that Mia was trying to hide. There wasn't a police checkpoint like there was in this court's decision in Smith, so if the perpetrator was trying to hide, they would have simply kept driving. And if Mia was trying to hide, why was the car door open, and why were the car lights on, increasing the visibility of the vehicle? As Mia freely concedes, once the officers detained him, they did a quick search and seizure, which may reflect on the officer's professionalism, but that fact is irrelevant to the extent of Mia's damages. There wasn't a basis to detain Mia, other than his proximity to a suspected crime scene at a particular time of day, and that isn't enough to supply reasonable suspicion. And the government's post-hoc attempts to try and justify the seizure by accusing him of trying to hide or behaving suspiciously, when all that he was doing was searching for his headphones in his own car, in his own driveway, and shut a door, lack any factual basis. Under this court's precedent, Mia's deta- Can you confirm? I think I know the answer, but I just want to confirm. Do you agree that the Roseboro issue doesn't matter if you went on the sort of first issue? I agree that if we went on the first issue, it doesn't matter in the context of his particular case, but I do still think that it matters, because this court's precedent has consistently said that the district court must issue a Roseboro notice, and the- Right, I guess I hesitate how much to get into this. It strikes me that you have a massive forfeiture problem, because the Roseboro issue wasn't raised in the informal opening brief, which under our decision, in Jackson v. Litesee, makes me think it's not before us. Well, respectfully, Your Honor, in Pledger, the Roseboro issue was never raised in the district court, and then this court- I'm not talking about it being raised in the district court, I'm talking about it being raised in the informal opening brief before this court. Okay. Then, to go back to your earlier question, Your Honor, we do not need to win on the Roseboro issue, but I would like to point out, regardless of whether it's waived or not in the context of this specific case, and why I do think it matters is that this court has said that pro se litigants are going to be ignorant of the summary judgment requirements, and the district court should give notice, and I think this manner of giving notice that the Eastern District of Virginia has said, we'll let the opposing party do it, and in this case, we'll do it in a footnote, is completely inconsistent with what- It is my understanding that this is relatively standard practice in the Eastern District of Virginia, and has probably been done in dozens of cases, and you want us to say they've been violating it this whole time? That's correct, Your Honor, and I think the two reasons why I take issue with that Eastern District of Virginia practice are, one, you're having the opposing party provide this to a pro se litigant, the pro se litigant might not trust the opposing party, and if you actually look at how it was given in the context of this specific case, it was a footnote in the initial motion, not in the memorandum of law, a pro se litigant might miss that. There are some judges who won't consider arguments that are raised in footnotes, so now it's being presented in a footnote. I've dealt with the issue in the Ninth Circuit, and the way that the Ninth Circuit deals with the issue, it's called a RAND notice. The district court issues a standalone ECF docket entry that says a summary judgment motion's been filed, here are the requirements, here's what you need to do. That draws attention to the fact that I need to submit affidavits, I could lose my entire case, but when you do it this way, through the other party that you may not trust, in a footnote that you may miss, there's no indication in Fourth Circuit precedent that that's how this Rosborough notice should be issued, and the reason that I've pressed this as much as I did in my brief is every day that this court doesn't clarify or correct that, there will be pro se litigants who are completely confused as to the Rosborough issue. Can I ask you another question? Sort of the question about everything that happens after the initial stop. Because I see your brief, I read your brief as not sort of raising an independent constitutional question to what happens after the initial stop. But do you also agree, like, but if the initial stop is valid, then everything else is also invalid, is your view the whole case would have to go back? If the initial stop is invalid, everything has to go back, because if the initial stop is invalid, it calls into question the validity of everything that happened after the initial stop? That's correct, Your Honor, I think that... But what you're not raising is a, assuming the initial stop is valid, you're not alleging that, I understand that's not your view, but if the initial stop was valid, you're not raising a constitutional challenge to anything that happens after that, if the initial stop was valid? Well, we had a footnote in our brief, I think this issue is waived, because there was the informal opening brief, and Mr. Mia didn't raise the issue, but we raised that once he exited the vehicle, police saw no blood on him, he was entirely cooperative, that there wasn't a basis to search him, to search him personally and to search the vehicle, so I think there is an argument that once he got out of the car... But irrespective, right, if the initial stop is invalid, then... Then everything's invalid, because the district court's reasoning was effectively, because the initial stop was valid, everything that happened after that point was valid. I think to pick up where I was, two things that really struck me about this case that relate to prior Fourth Circuit cases. One is this court's decision in Peters, which was written by Judge Gregory, that pointed out that there was no observation of him in the driveway. If you actually look at the sequence of this case, and you look at the affidavits, what you see is, law enforcement identifies a hot car in a gas station, says, are there any people walking or running around, probably because law enforcement came to the same conclusion that I came to, which is, I would initially have assumed that the stabbing happened on foot and didn't involve a vehicle, I haven't heard of the phrase drive-by stabbing before, but they ask, is there anyone walking or running around, and then you hear, yeah, no, there isn't, but we see a vehicle in this driveway. The affidavit then says, based on the identification of the vehicle in the driveway, I decided to go investigate what was happening. They then pull up, the door is shut, they don't identify themselves as law enforcement, which is significant under this court's decision in Critchfield, because to the extent they want to argue that he was behaving evasively or trying to hide a nervous or evasive reaction to an unidentified member of law enforcement is less probative, but they pull up, he slowly closes the door, and then they immediately search him. This was not a Terry stop of officers on the beat observing somebody for some period of time and forming reasonable suspicion. It was a stop in which the officers knew that there was a stabbing, they were trying to identify anybody around, and then the second they pulled up at the house, they decided to search him, and I think that this court's decision in Peters speaks to that issue of it being an immediate show up and search without doing any sort of investigation or observation. I assume you agree that they could have knocked on the window, right? Or they could have asked, they could have done a roll down your window. They could have done that, right? Because that wouldn't have implicated the Fourth Amendment at all. Yeah, they could have readily went and spoken to him and asked him to cooperate, and if they did, he still could have shut the door. He had a right to go about his business and to refuse to cooperate with law enforcement. I would just add on this, I think the facts in this case are even weaker than they are in other cases in which this court has found reasonable suspicion lacking. If you look at the Foster decision, which they rely on in support of qualified immunity, I don't think it helps them on qualified immunity at all because it runs through the same factors here, finds that they're not enough, and then says the security check takes it over the top. But you have a late hour, midnight, you have reports of shot fired, they see an individual who looks like he's on drugs who doesn't respond. What they have here is early in the morning, and I looked up the day of the week, this was a Friday morning. So 4.20 in the morning, as far as I'm concerned, on a school day, on a work day, is not that suspicious in Northern Virginia. And I know, Judge Heitens, you sit in Alexandria. Northern Virginia is the military capital of the world. This could have been somebody going to a drill. This could have been a parent taking somebody to an extracurricular activity before school, before camp. When you look at all these facts here, you have unidentified law enforcement pulling up, so this person's not refusing to cooperate with police. They have no idea who's pulled up into their driveway. There's no evidence that he's on drugs. He's in a residential driveway. And I could run through five or six other cases where this court has looked at more egregious factors, Sprinkle, Slocum, and not found reasonable suspicion. And I think what really is missing here in those affidavits is any sort of articulation of any kind as to why the behavior is suspicious. Why is it suspicious that he's in a car? There's no indication that a car was involved in this. Why is it suspicious that he was sitting in the car? This court has issued three cases where somebody in black was sitting in a car for three minutes. That wasn't suspicious. In David Foster, somebody was sitting in a car for 15 minutes. That wasn't suspicious. In Sprinkle, two people were sitting in a car huddled over a console. That wasn't suspicious. He was crouching down. Well, in the David Foster decision, which is another decision that Judge Gregory wrote, he pointed out you could be slouched down in a car or crouching over to pick something off the floor, which is exactly what was happening here. There's no articulation anywhere in these affidavits as to why the particular behavior was suspicious. It's just based on these factors, I decided to detain him. You can't do that under Curry, Massenburg, and Foster. Unless this court has any further questions, I'll yield the remainder of my time. But for the reasons set forth in our brief, Mia's detention, search, and seizure violated the Fourth Amendment and the District Court's summary judgment order should be reversed and qualified immunity does not apply.  Thank you, Mr. Riola. Ms. Balcom. Thank you. Good morning, and may it please the Court. I'm Kimberly Balcom. I'm here on behalf of the appellee's officers, Derek Brown and Shane McComas. Our position here is that these officers responded to this 911 call. It was a call for a violent felony that had taken place. The individual who called the police was at the gas station and reported to the police via 911 that someone had been stabbed. And so that is the information that the officers take in, and they respond in accordance to that. In addition, they knew that the victim of that stabbing was covered in blood, was banging on the doors at the gas station. The individual who called the police had locked herself inside because she was afraid of what was happening. My two clients, officers Brown and McComas, started in that direction and received additional information while they were en route that caused them to divert to this hot car that was found by the helicopter. They did ask whether there were any individuals that were walking or running away. That was important for officers to know because they're trying to get to the scope of potentially who's around and who might they need to make contact with. There's not anyone who was walking or running. The only car that was identified by the helicopter officers that was hot, meaning that it had recently been operated, other than the two cars at the gas pumps at the gas station where other officers were already present, was Mr. Mia's vehicle. Mr. Mia is not simply someone who is just sitting in his vehicle. He is someone who is two-tenths of a mile away from what officers concluded reasonably. Counsel, excuse me, let me ask you this question and hold your thought because you're talking about he's not an ordinary person, so help you remember. How much time in this record elapsed between the call and the officer's arrival? Approximately seven minutes. So seven minutes. And then, of course, so seven minutes, so you're talking about someone who perhaps may have stabbed this person, right, in a car. Seven minutes, and then the person you stopped was only 0.10 away? Two-tenths of a mile. You could almost walk that far in seven minutes, couldn't you? You could, Your Honor. Let alone driving. Okay, I just want to make sure. That's true. So you stopped a car that was that close but had a car. But go ahead. And I would point, Your Honor, to the U.S. v. Smith case. And counsel does point out that U.S. v. Smith is a checkpoint case. This obviously isn't a checkpoint case. But the logic follows that I think we wouldn't necessarily assume that just because someone's in a car that they would flee to infinity, especially because this individual, Mr. Mia, is positioned halfway into a driveway that's close by to where this police activity, emergency activity is going on, just like the defendant in the Smith case who pulled into a driveway close to a checkpoint, then the court found that that was reasonable for officers to develop their reasonable articulable suspicion. But isn't this case more like Foster or Black? There's no connection with Mr. Miller who's sitting in his car. I do agree that it's – I think that Foster actually helps my clients more. And the reason for that is because in Foster, as opposed to the cases that counsel is bringing before the court, Massenburg, Curry, those cases that have one or two factors, they're based on anonymous tips or confidential informant information, what we have here are multiple facts that when the officers get on scene and they see Mr. Miller ducked down in the vehicle, when they pull into the driveway, the door shuts. Yeah, but he brought this argument, they turned off their lights. How was he supposed to know that that was law enforcement? That's true. And I don't think I can argue to you that he knew it was law enforcement at that moment and shut his door because of that. So that's not reasonable suspicion. Well, what I would say is that it is reasonable suspicion when it's combined with the other factors. He's halfway into the driveway, his door is open and he's ducked down into the passenger compartment, and when the officers pull up, he shuts the door and he ducks back down into the passenger compartment. And I think what's really important here is that second ducking. He's shutting the door, but he's ducking back down. But he has no idea who's pulling up. I think I have to agree with you there. So how is that reasonably suspicious? Because to these officers who are two-tenths of a mile away from a stabbing that has recently occurred, that victim is still on scene and they're trying to figure out who is nearby, who could have participated in this crime. Someone who is in a vehicle that has recently been used, who is halfway into a driveway of a residence, who's not beyond the gate of the residence, and so the officers have no reason to think that he's at his own house. He is simply in this place. I would note also that the helicopter is above his car circling for three minutes while they observe him in the vehicle. He doesn't move to the point where the helicopter officers are radioing that they're not even sure if there's a person inside the car or if it's just a heat signature from where someone was sitting. And so he's sitting still in the driveway for these three minutes while the helicopter is circling overhead, and when one of my clients pulls in, he shuts the door and he ducks down into the interior of the vehicle. Does he claim that he didn't duck down? It's visible. He does, but it's visible on the officers' in-car video. You see black in the back window, and then right before he pulls the car door shut, you see his head and shoulders appear in the frame. He reaches out, pulls the door shut, and then immediately he just goes back down. And he doesn't sit back up again until the officers provide him with commands to show his hands and exit the vehicle. Do you think under Scott v. Harris we can just ignore his testimony to the contrary? I think that it is refuted by the video, and so we can ignore that for purposes of summary judgment. Yes, I do. How does this square with Curry? In a couple of ways. In the Curry case, there's a report for shots fired. Here we have, and it's shots fired in the general vicinity. Here we have an identified victim of a stabbing. He's bleeding profusely at the Shell gas station, and so I think officers' focus is more appropriately truncated in this case. You think it was more dangerous in terms of, obviously, it's sad that someone is stabbed, but that has happened. That's more dangerous than Curry when it was in a public housing where it was a gunshot, several gunshots, and people are running away? That's not more existential? I think it's as dangerous as what happened in the Curry. That's what I'm saying. How does that square with Curry? You're trying to distinguish it because this is more, I'm just, and you can see that it's best equally so. And he was, right? Right. And he refused it, but they said they stopped him, and then they searched him. Right. I think that this plaintiff was engaged in more suspicious behavior than the individual who was stopped in the Curry case, and the court points out there are other people in the vicinity that are acting in the same manner as Curry, but law enforcement only focused on him. Here we have law enforcement officers that are focusing on one person because he is the one person who's been identified by the helicopter officers as someone who is in the vicinity in a vehicle that appears to have recently been driven. And so there are cars, you know, up and down the roads, but there's no reason to... Did the helicopter see his car moving? No, it did not. So then he could have started his car, and it was hot from him being never driven. That is true. So that puts a lot of people in... One of the things about the drag net in the Fourth Amendment when such a broad class of innocent people could be involved, so anyone with a hot car in the area, they could do the same thing to. I disagree. I think anyone in a hot car in the area who is, again, halfway into a driveway, who is ducked down into the interior of the vehicle... I don't know why people do what they do. My point is... No, you have to be... We're talking about some reasonable suspicion, right? Reasonable suspicion. You just stabbed someone. You say that. I noticed how you did it. Very well, you sort of said, well, it's not unusual to stay in the area. You have a car because it doesn't square with having a car. In seven minutes, you're no further away than two-tenths of a mile. So you said, it's not unusual to stay, hang around. Do you hang around in a suspicious park way? Does that make sense? If you just stabbed somebody, I'm going to park as neatly as I can. Why? That doesn't make sense. That's common sense. I think it does, Your Honor. It does? Tell me why that makes common sense. You just stabbed someone, so you're going to park your car and make it suspicious in terms of just hanging out on the street. Because I think law enforcement officers would reasonably conclude that people who commit crimes can do multiple different things. They could run on foot. They could flee in a car and flee for 15 minutes until they feel like they're far enough away. Or, like what these officers reasonably concluded here, they could go to a place where they could pull off of the main road, and so if officers are responding, they're not passing those officers on the street. But he had his door open and his lights on. He didn't have his lights on. He had the brake lights were on. Well, the brake lights were on. The brake lights were lit. So the lights were on and the door was open. And he was crouched down inside the car. And so that's reasonably suspicious of hiding from the police? Yes, that's what these officers concluded. The lights on the car and the door open? Because he was crouched down on the interior of the car. And I think it's important to note, too, that one of the things that was pointed out that these officers could have done would have been to approach the vehicle and knock on the window. And I think it's important to talk about the fact that, given the perspective that these officers had, which was that they were responding to potentially someone who is suspected of stabbing another individual and who is crouched down inside the interior of that car while it's dark outside, that that's an officer safety issue that they're obviously trying to avoid by providing commands for Mr. Mia to get out of the vehicle while they're standing at the safety of their cruiser. What about running the plates? They certainly could have done that, but we know based on case law that just because there is another avenue that they could have taken, they're not required to if otherwise their behavior is commensurate with the Fourth Amendment. And so from their perspective, again... Right, otherwise it is commensurate. Yes, yes. That's the big problem. I can see that. And if they had checked it and found that he was at his own home. That is true. That is true. They did not know that when they arrived, he was outside of that gate. They didn't have to know. They said he was there for three minutes, you said. He wasn't leaving anywhere. I mean, this is a suspect who stabbed someone in a car, door open, not moving, parked irregular. So you check whether or not he's in a home. He's in a private driveway, right? He is. And therefore it's identified with a specific home, right? Yes. And a plate is also. And that would have been safe for the officers, wouldn't it? Well, what I would say to that, though, is, again, you've got a suspect who has committed a violent crime, potentially they're looking for that person. And so law enforcement officers always have to weigh, is it safe for me to sit here in my vehicle and run this license plate? Or is the safer option, because I believe that I have reasonable articulable suspicion, to separate that person from the vehicle, detain them, and then make sure that there's, as the officers articulated, no other suspects or victims in the vehicle, no knives that are in play. And once they confirm that, then they go about their attempt to identify whether Mr. Mia is associated with that house. And once they realize that that's the situation, they explain to him why they stopped him, why they thought it was suspicious that he had ducked down inside of the vehicle, to explain why they had done what they did. And they very quickly released him. And their actions during that detention can certainly play into the conclusion that they were acting reasonably on that day. They were trying to address a dangerous situation that had just occurred very close by, identified him as the only individual in the area that was acting in a way that they concluded was suspicious, and they took those brief actions in order to determine whether or not he was involved. As soon as they confirmed that he was not, he was free to leave, and they explained to him what they had done. And so we would submit to Your Honor that that was reasonable articulable suspicion. With regard to the Roseboro notice, I would like to just briefly address that because Your Honor did. I do agree that the Roseboro issue is not an issue if Mr. Mia is successful. I do agree with the assertion that this is how it's done in the Eastern District. It's how we've done it in the Eastern District long term. It never makes me comfortable to tell a judge that we did it because this is how we always do it. And so I would just point, Your Honors, to the local rules, which provide that the Roseboro notice is given by the opposing litigant. The local rule specifically permits the provision of the Roseboro notice in a footnote, and so that's why it was in the footnote. I would point you to— It is kind of hard to square with what we've actually said, which is that the court is supposed to do it, right? You know, it's an interesting—when you review the— I mean, I know—I don't blame you for doing what the district court is telling you to do, but what the district court is doing doesn't really square with what we've said is supposed to happen. Yeah, and the point I would make to that is there is certainly case law that says the district court is to provide the Roseboro notice, but there are also cases where the litigant who opposes provides the Roseboro notice, and that has been deemed sufficient. And I would also point out that Mr. Mia did respond to the motion for summary judgment. He didn't submit affidavits, but in the district judge's opinion, he does point out that—I think twofold— Mr. Mia isn't in a position really where he's arguing that my material facts aren't accepted or that there are additional material facts that play into the analysis, but that to the extent that the district court saw those alleged facts, the judge did consider them in determining summary judgment. And so I would just submit that the Roseboro notice was sufficiently provided. Mr. Mia sufficiently responded to summary judgment and would ask that the district court's decision be affirmed. Thank you. Thank you, Ms. Dahlgren. Mr. Rowland, you have some time. I have a couple quick points, Your Honor. First, I want to start with Curry, and I think that this case is way weaker than the case in Curry for a couple of reasons, but as I understand Curry, Curry establishes that when there is this type of emergency situation, you need some basis to narrow your search to a subset of individuals in order to do the search. You need a description of the suspect. You need an identification that the suspect is still in the vicinity of the crime in order to engage in that broader than reasonable suspicion search. In Curry, the officers heard the shots. They then went to the housing court, and they had confirmation that the shots occurred. Here's what happened here. Somebody called, observed somebody banging on a door, and said, and I can't fully understand the chronology, but if you look at page 85 of the excerpts of the record, the chronology says, looks like the person has been stabbed, and then on 86, the person who made this call says, looks like he was stabbed across the street. So this is somebody who didn't observe the stabbing. When the cops show up, the person refuses to confirm that they've been stabbed. They have a tourniquet on their arm, and this happened across the street. Who knows how long it took to make that tourniquet before you came across the street to the gas station, but this could have happened 30 or 45 minutes earlier, and now you've got somebody in a car 0.2 miles away, no confirmation that there's even been a stabbing, and that's the fact set up here compared to Curry where there were shots fired that the officers heard. It is a much weaker case than Curry. The second point I'd like to make is with respect to this ducking down. This court's decision in Slocum is really clear. When the suspect does not attempt to leave the area or flee, you need extreme acts of nervousness or evasion. He didn't move his car anywhere. So under this court's decision in Slocum, this is not one of those extreme acts of evasion that then provides reasonable suspicion that he ducked down. In the Foster case, again, which I don't think helps them because you have shots fired, the only person encountered, late at night, high crime area. It was at midnight, not at 4 in the morning, where you could have a parent taking their kid to school or somebody going to military drill or going to Dulles International Airport to take an international flight. But the person was drugged out and didn't respond to an identified member of law enforcement. This is a much weaker case in Slocum. In that case, when the person didn't respond, this court said you have a right to go about your business and refused to cooperate. So I think the ducking down really gets the government nowhere. I want to go next to the Smith decision. I don't know how that decision is anywhere comparable to this decision. Smith, a person was driving up to a police checkpoint, slammed on the brakes. They watched in real time him drive into a driveway that was 200 meters long, stop in the middle of it. And that indicated to them this person wasn't pulling up to the house. This person was not trying to turn around because they didn't want to get stuck in the roadblock. They were trying to evade the roadblock. This situation of somebody right outside the gate of a driveway is consistent with something that happens at my parents' house when me and my parents are going somewhere. And it's quite feasible that we'd go somewhere early in the morning when I was younger and I had to go to crew practice or I needed to get to school early for some reason. But you've got somebody outside the gate potentially waiting for somebody to come out into the car. I don't know why every time my family goes somewhere somebody is lingering in the house for a couple minutes. So you have a door open, it's June, it's humid, so of course I'd probably have my door open if I was sitting in a hot car. All of that is consistent with innocent behavior. And the government never articulates at any point, counsel articulates it, but certainly not the officers, why it was suspicious that somebody would be sitting in the car with the door open for three minutes when they're right outside a residence and somebody could have been coming to get into the car. And then the other point I'd like to make is just to go back to this court's decision in Peters and the failure to check the license plate. This court looked in Peters at a situation in which two officers showed up and they see two people walking, think that there may be a trespass case, immediately get out of the car and immediately search them for weapons. And this court said this is different than a Terry stop where the officers were observing what was going on for a couple minutes and formed reasonable suspicion and then detained them. This was a generalized search for weapons because they didn't do any observation and they just jumped straight through let's skip the interaction where we ask questions and see if that dispels our suspicion or the people will cooperate. Let's just skip that and let's detain them. That's exactly what happened here. There was no voluntary interaction with Mr. Mia before they detained him. And instead of showing up and then immediately searching him, underscoring that this was a generalized search for anybody in the vicinity of the crime, one that was impermissible under Curry, they had every ability to check the license plate and there are quotes in this court's decisions and in Terry, if they were really concerned about their safety, then they can walk away if they have no reasonable suspicion to believe that a crime occurred. For the reasons set forth in our brief, we think that it is quite clear that the search in this case violated the Fourth Amendment, is inconsistent with this court's, a uniform body of this court's decisions, Curry, Massenburg, Foster, and I could go on, but I'll stop there. For the reasons set forth in our brief, the district court's summary judgment order should be reversed. Thank you. Thank you. Mr. Real, I note that your opponent is Amicus Curry. Thank you very much. I appreciate lawyers like yourself to assist us and the full circuit appreciates you on behalf of the court. Of course, Ms. Balcom as well, your able representation in the United States. We will come down, greet counsel, and proceed to our next case. Thank you.
judges: Roger L. Gregory, Toby J. Heytens, DeAndrea Gist Benjamin